IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LAMSON TRONG PHAM,

                    Petitioner,

    vs.

MICHAEL STAINER, Warden,

                    Respondent.

Case No. 2:08-cv-02191-JKS

MEMORANDUM DECISION

Petitioner, Lamson Trong Pham, a state prisoner proceeding *pro se*, has filed a Petition

for Writ of Habeas Corpus under 28 U.S.C. § 2254.  Pham is currently in the custody of the

California Department of Corrections and Rehabilitation, incarcerated at the California

Correctional Institution in Tehachapi, California.  Respondent has filed an answer, and Pham has

filed a traverse.

PROCEDURAL HISTORY

Following a gang shooting at a private residence, a jury convicted Pham of second-

degree murder and two counts of attempted murder.[1]  As to each count, the jury found that Pham

had personally used a firearm, personally discharged a firearm, and caused great bodily injury or

death by using a firearm.  The trial court sentenced Pham to an indeterminate term of 15 years to

life with the possibility of parole for the murder conviction, plus a determinate term of nine

---

[1] Lamson Trong Pham, Bruce Huy Phan, and Sutter Nguyen were charged and tried
jointly pursuant to a consolidated information.

years, four months, for the attempted murders, plus consecutive terms of 25 years to life for each of the firearm enhancements.

Pham appealed his conviction, and on January 22, 2008, the California Court of Appeal, Third District, affirmed his conviction in a reasoned, unreported decision.[2]  Pham then filed a petition for review with the California Supreme Court, which was denied on May 14, 2008. Pham did not seek post-conviction habeas relief in the state courts.

On September 17, 2008, Pham timely filed a Petition for habeas corpus relief in this Court.  In his Petition, Pham raises three grounds for relief:

1.      The prosecutor improperly used his peremptory challenges to exclude jurors on the basis of their race;

2.      The trial court erred by allowing the admission of gang evidence; and,

3.      The trial court intruded on the deliberative process to coerce a verdict.

Respondent concedes that all of Pham's grounds for relief are properly exhausted and does not contend that any of Pham's grounds are procedurally barred.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

---

[2]  *People v. Lamson Trong Pham*, 2008 WL 176473 (Cal. App. Jan 22, 2008).

proceeding."[3]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

time of the relevant state-court decision."[4]  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.[5]  Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[6]  When a claim falls under the

"unreasonable application" prong, a state court's application of Supreme Court precedent must

be objectively unreasonable, not just incorrect or erroneous.[7]  The Supreme Court has made clear

that the objectively unreasonable standard is a substantially higher threshold than simply

believing that the state court determination was incorrect.[8]  "[A]bsent a specific constitutional

violation, federal habeas corpus review of trial error is limited to whether the error 'so infected

---

[3] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[4] *Williams*, 529 U.S. at 412.

[5] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[6] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations by the Court); *see Wright v. Van Patten*, 552 U.S. 120, 127 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[7] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[8] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

the trial with unfairness as to make the resulting conviction a denial of due process.'"[9]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state-court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[10]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[11]

In applying this standard, this Court reviews the last reasoned decision by the state court.[12]  State appellate court decisions that affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[13]  Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[14]  This presumption applies to state trial courts and appellate courts alike.[15]

---

[9] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[10] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[11] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[12] *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004).

[13] *Ylst*, 501 U.S. at 802-03.

[14] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[15] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

When there is no reasoned state court decision denying an issue presented to the state court and raised in a federal habeas petition, this Court must presume that the state court decided all the issues presented to it and perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.[16]  In so doing, because it is not clear that it did not so do, the Court presumes that the state court decided the claim on the merits; and the decision rested on federal grounds, giving the presumed decision the same deference as a reasoned decision.[17]  The scope of this review is for clear error of the state court ruling on the petition:

> [A]lthough we cannot undertake our review by analyzing the basis for the state court's decision, we can view it through the "objectively reasonable" lens ground by *Williams* . . . .  Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.  Only by that examination may we determine whether the state court's decision was objectively reasonable.[18]

"[A]lthough we independently review the record, we still defer to the state court's ultimate decision."[19]

---

[16] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam).

[17] *Harrington v. Richter*, 562 U.S. ---, 131 S. Ct. 770, 784-85 (2011) (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference); *see Harris v. Reed*, 489 U.S. 255, 263 (1989); *Coleman v. Thompson*, 501 U.S. 722, 740 (1991).

[18] *Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000) (internal citation omitted); *see also Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004).

[19] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. *Cf. Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)."

DISCUSSION

As noted above, Pham raises three grounds for relief.  For purposes of clarity, this Court

will address them in the order presented.

Prosecutor Improperly Used Peremptory Challenges

Pham claims that the prosecutor improperly used his peremptory challenges to exclude

certain jurors on the basis of their race.[20]  In his Traverse, Pham narrows his claim and informs

this Court exactly which jurors he claims were improperly excluded: Irene M., Amber D., Clem

C. and Gilda B.[21]

The Equal Protection Clause prohibits purposeful racial discrimination in the selection of

the venire.[22]  In *Batson*, the Supreme Court outlined a three-step process for evaluating claims

that a prosecutor has used peremptory challenges in a manner violating the Equal Protection

Clause:  1) A defendant raising a *Batson* claim must establish a *prima facie* case of

---

[20]  In his Traverse, for the first time, Pham also claims that the prosecutor improperly excluded certain jurors on the basis of their gender.  This Court does not ordinarily consider grounds raised for the first time in the traverse.  "The petition must: (1) specify *all* the grounds for relief available to the petitioner; (2) state the facts supporting each ground; [and] (3) state the relief requested . . . ."  Rules–Section 2254 Cases, Rule 2(c) (emphasis added).  To the extent that Pham wishes to raise additional grounds, the proper procedure would be to file a motion to amend the petition under Federal Rule of Civil Procedure 15.  In this case, however, such a motion would be futile because the amendment would not relate back to the initial filing and would, therefore, be barred by the one-year limitation period of 28 U.S.C. § 2244(d)(1).  *Mayle v. Felix*, 545 US 644, 655-64 (2005).  Consequently, this Court declines to address the allegation of exclusion on the basis of gender.

[21]  During the jury selection process, and again on direct appeal, Pham's counsel objected to the exclusion of seven jurors: Jose R., Irene M., Amber D., Wanda S., Clem C., Gilda B. and Miss M.  In his Petition, Pham simply claims that the prosecutor improperly excluded jurors on the basis of their race, but he does not specify to which jurors he is referring.  In his Traverse, Pham narrows his argument to focus on the exclusion of: Irene M., Amber D., Clem C. and Gilda B.

[22]  *Batson v. Kentucky*, 476 U.S. 79, 106 (1986).

discrimination; 2) once a *prima facie* case of discrimination is established, the burden of offering

race-neutral reasons for the strikes shifts to the prosecutor; 3) after the prosecutor offers race-

neutral reasons, the trial court has the duty to determine if defendant has established purposeful

discrimination.[23]   When the record suggests that there is an objective reason to strike a juror,

there is an implication that racial bias did not motivate the prosecutor.[24]   The trial court may also

engage in a comparative analysis between the struck juror and the empaneled jurors in order to

determine whether the facially-race-neutral reasons are a pretext for discrimination.[25]

       "The trial court has a pivotal role in evaluating *Batson* claims.  Step three of the *Batson*

inquiry involves an evaluation of the prosecutor's credibility and 'the best evidence [of

discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.'"[26]

The Supreme Court has held that on direct appeal, "a trial court's ruling on the issue of

discriminatory intent must be sustained unless it is clearly erroneous."[27]   This deference

presumably applies equally to a state-court decision based on *People v. Wheeler*, 22 Cal.3d 258,

280 (1978), because it is the procedural equivalent of a federal *Batson* challenge.[28]   In the

context of a habeas case, this Court must also grant an additional level of deference to the

California Court of Appeal; this Court may only grant relief if the decision of the state court

_____

       [23] *Paulino v. Harrison*, 542 F.3d 692, 699 (9th Cir. 2008) (citing *Batson*, 476 U.S. at 98).

       [24]  *Boyd v. Newland*, 467 F.3d 1139, 1145-47 (9th Cir. 2006).

       [25]  *See id.*; *Cooke v. LaMarque*, 593 F.3d 810, 815-16 (9th Cir. 2010).

       [26]  *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (internal citations omitted).

       [27]  *Id.*

       [28]  In California, a *Wheeler* motion is the procedural equivalent of a federal *Batson*
challenge.  *See Tolbert v. Page*, 182 F.3d 677, 679 (9th Cir. 1999) (en banc).

constituted an unreasonable application of *Batson*.  Recently, in *Felkner v. Jackson*,[29] the Supreme Court emphasized the high level of deference due to state-court *Batson* decisions—especially when the state court has "carefully reviewed the record at some length in upholding the trial court's findings."[30]

During the jury selection, Pham's counsel raised a *Batson/Wheeler* objection, claiming that the prosecutor had improperly excluded several minority jurors on the basis of their race. The trial court found the defense had made a *prima facie* showing of discrimination and asked the prosecutor to explain his reasons for excluding the minority jurors.  The prosecutor provided racially-neutral reasons for excluding each of the jurors in question, and the trial court was satisfied that the prosecutor had not acted improperly.  The California Court of Appeal affirmed this conclusion on direct appeal.

Irene M.

Irene M., who was presumed to be Hispanic, was removed from the jury on the basis of a preemptive challenge.  When prompted to give a racially-neutral explanation for dismissing Irene M. the prosecutor said he excluded her because: "she was raised in 'the hood' and never had a problem, and the attitude with which she said that led [him] to believe that she had special knowledge of gangs and had dealt with gang members and had no problem with gangs."[31]  The trial court held that this was an acceptable, racially-neutral reason for dismissal.

The California Court of Appeal also rejected Pham's Batson claim, holding:

---

[29]  563 U.S. __, 131 S. Ct. 1305, __ (2011).

[30]  Id. at *3.

[31]  *Lamson Trong Pham*, 2008 WL 176473 at *26.

8

The prosecutor said he excluded Irene M., not merely because she said she was raised in "the hood" and never had a problem with gangs, but because the attitude with which she said it led the prosecutor to believe that she had special knowledge of gangs and had dealt with gang members and had no problem with gang members.

Defendants claim Irene M. said her awareness of gangs came from hearing her mother and other women discuss having seen gang members in stores. However, what she said was that, as she was growing up, she knew individuals who were allegedly in gangs. When asked if she had personal experience with gang members, she said, "Not per s[e] that they did this or-or but, you know, you sort of knew neighborhoods because maybe the mothers would-would discuss it with-with other mothers. They might have seen them at the grocery stores or something like that."

Defendants say the record does not support the prosecutor's assertion that Irene M. had special knowledge or had dealt with gangs. They also cite Irene M.'s statement that her experience would not affect her ability to be fair, nor would it cause her automatically to believe or disbelieve testimony of gang members or associates.

However, defendants neglect to acknowledge that the prosecutor, in giving his reasons regarding Irene M., pointed not only to her words, but also her "attitude." This was a matter for assessment by the trial court, which had the opportunity to observe the prospective juror. The court implicitly accepted the prosecutor's view.

Defendants contend the prosecutor's reasons regarding Irene M. were a sham, because the prosecutor kept on the jury two persons (Jurors 7 and 11), each of whom had experience with or exposure to gangs at least as extensive as Irene M. Again, defendants fail to acknowledge the prosecutor's reference to Irene M.'s attitude, which is a matter for the trial judge who observed her, not for a reviewing court working with a cold record.  Defendants fail to show grounds for reversal with respect to Irene M.[32]

In his Traverse, Pham asserts that the prosecutor's claim that Irene M. had a particularly special knowledge of gangs was not supported by the record.[33]  He notes that the trial court made no findings regarding Irene M.'s demeanor, and thus, the Court of Appeal's decision is not entitled to deference.

---

[32] *Id.* at *30.

[33] Pham notes that Juror Nos. 7 and 11 also had knowledge of gangs and were permitted to sit on the jury.  At best, Irene M. gave conflicting testimony regarding her experience with gang members.  Although she says she knew individuals who were allegedly in gangs, when she was asked if she had personal experience with gang members, she said, "Not per s[e] that they did this or-or but, you know, you sort of knew neighborhoods because maybe the mothers would-would discuss it with-with other mothers.  They might have seen them at the grocery stores or something like that."  *Lamson Trong Pham*, 2008 WL 176473 at *30.

Pham's argument to this Court suffers from the same defect that the Court of Appeal noted: the prosecutor excluded Irene M. on the basis of her *attitude* toward gangs and gang members. The record indicates that Irene M. grew up in a neighborhood with gang members and heard her mother discuss gangs with other local women. Based on her description of her experience with gangs and gang members, the prosecutor concluded that her attitude toward gang related matters was not favorable to his case. Although the trial court did not make a finding on the record with regard to Irene M.'s demeanor, because this was the only reason given for her dismissal, the Court of Appeal did not err by concluding that the trial court implicitly agreed with the prosecutor.[34] Pham has failed to show that decision of the California Court of Appeal was contrary to established federal law, or that it constituted an unreasonable determination of the facts. Pham is not entitled to relief on this claim.

<u>Amber D.</u>

Amber D., who was also believed to be Hispanic, was removed from the jury on the basis of a preemptive challenge. When prompted to give a racially-neutral explanation for dismissing Amber D., the prosecutor said he excluded her because: she "had a nephew serving a

---

[34] In *Snyder*, in response to a *Batson* motion, the prosecutor provided two reasons for dismissing a prospective minority juror Mr. Brooks: Brooks' nervous demeanor, and; the fact that Brooks had a student-teaching obligation which would be negatively impacted if he was required to serve on the jury. The trial court accepted the prosecutor's justifications without explicitly ruling on Brooks' demeanor. On appeal, the Ninth Circuit found that Brooks' student-teaching obligation would not interfere with his jury service. The court then held that, because the trial court had not ruled on Brooks' demeanor, it could not presume that the trial judge credited the prosecutor's assertion that Brooks was nervous. The court concluded the trial judge may have found it unnecessary to consider Brooks' demeanor, instead basing his ruling completely on the second proffered justification for the strike. *Snyder* is distinguishable from the facts of Pham's case because, unlike the prosecutor in *Snyder*, the prosecutor in Pham's case only gave one reason for dismissing Irene M.

25-year-to-life sentence for murder (thus she knew the penalty for murder) and had a relative

involved in a self-defense issue (and self-defense was an issue in this case)."[35]  The trial court

held that these were acceptable, racially-neutral reasons for dismissal, and the Court of Appeal

agreed:

> The prosecutor excluded Amber D. because she had a nephew serving 25 years to life for murder (thus she knew the penalty for murder) and had another nephew involved in a shooting who was not charged because the prosecution concluded he acted in defense of his mother during a domestic violence incident. The prosecutor noted self-defense was an issue in this case.
>
> Defendants argue Amber D. was not that close to either nephew's case, and the self-defense case was 15 years ago, and she said she could remain impartial. Defendants contend Amber D. had other facets that would make her seem to be pro-prosecution, i.e., she had been a victim of several crimes and had a brother-in-law who was a prison guard. Again, however, the prosecutor was not required to come to the same assessment as defendants.
>
> Defendants argue by comparison that the prosecutor allowed to remain on the jury persons who had been convicted of crimes or had friends convicted of crimes.  One juror had two DUIs, another had a dishonorable discharge for marijuana, and another had a friend who was shot and killed and the defendant asserted self-defense.
>
> However, none of these jurors knew anyone serving prison time for murder. Knowing a murder victim is different than knowing a murderer. Moreover, the prosecutor adequately explained he did not consider DUIs or marijuana use significant enough to prejudice a juror against the prosecutor in a murder case.
>
> Thus, even assuming Amber D. was a minority, defendants fail to show grounds for reversal with respect to her.[36]

In his Traverse, Pham argues that neither of the proffered reasons show that Amber D.

would have been biased toward the prosecution.  However, "[a]s previously noted, the question

presented at the third stage of the Batson inquiry is whether the defendant has shown purposeful

discrimination."[37]  Thus, while implausible or fantastic justifications may (and probably will) be

---

[35] *Lamson Trong Pham*, 2008 WL 176473 at *26.

[36] *Id.* at *30-31.

[37] *Snyder*, 552 U.S. at 484-85 (internal quotations omitted).

found to be pretexts for purposeful discrimination, the Supreme Court has never held that the prosecution and defense must agree on the nature and extent of a potential juror bias toward the prosecution's case.[38]

With respect to Amber D., the prosecutor gave two reasons for dismissing her: that a relative of hers was serving 25 to life for murder, and that another relative had been involved in a shooting, but was not charged after the authorities concluded he had acted in self-defense.

Pham engages in a comparative juror analysis and concludes that, since some of the individuals who were selected to serve on the jury had criminal records or had friends who were convicted of crimes, Amber D. should have been allowed to serve on the jury.  However, as the Court of Appeal notes, none of the empaneled jurors knew anyone who had been convicted of murder, nor did any of the other jurors appear to know the penalty for murder.[39]  As the Court of Appeal noted, "the prosecutor adequately explained he did not consider DUIs or marijuana use significant enough to prejudice a juror against the prosecutor in a murder case."[40]  Amber D. was also related to an individual who was involved in a shooting, but who had successfully asserted self-defense and avoided criminal charges.  As the prosecution noted, it appeared that self-defense would be an issue in Pham's case, and he wanted to avoid empaneling someone who might be slightly partial to this strategy.[41]  While Amber D. did appear to have some traits which

---

[38] *See Purkett v. Elem*, 514 U.S. 765, 768 (1995).

[39] During voire dire, Amber D. stated that her nephew was serving twenty-five to life.

[40] *Lamson Trong Pham*, 2008 WL 176473 at *31.

[41] The empaneled jury did include one juror who had a friend who was shot and killed and the defendant asserted self-defense.  However, this does not demonstrate a potential bias against the prosecution in this case (in fact, quite the opposite).

would make her appear to be "pro-prosecution," i.e., she had been a victim of several crimes and had a brother-in-law who was a prison guard, the prosecution is allowed to make its own value judgments as to the pros and cons of each individual juror.

Both of the racially-neutral reasons for dismissing Amber D. are to be supported by the record and are not pretextual. Pham has failed to show that decision of the California Court of Appeal was contrary to established federal law, or that it constituted an unreasonable determination of the facts. Pham is not entitled to relief on this claim.

<u>Clem C.</u>

Clem C., who was Filipino, was dismissed on the basis of a peremptory challenge. When asked to give a racially-neutral reason for dismissing Clem C., the prosecutor expressed concern that "Clem C. had been prosecuted and believed the jurors in his case were a 'wanting to go home at 4:00 kind of jury,' so he just pled guilty even though he felt he was not guilty."[42] The trial court found this racially-neutral explanation to be acceptable, and the Court of Appeal agreed, holding:

> Defendants point out Clem C. also said he blamed himself for his legal troubles, in that he was accused of carrying a concealed weapon without a permit after he placed a gun in his garment bag to hide it from his toddler son and forgot about the gun until it triggered the metal detector at the airport. Defendants also note Clem C. was an auditor with the Environmental Protection Agency, had previously served on a jury, had a sister who was a judge, and had relatives who worked at the Department of Justice and District Attorney's Office.
> None of these points renders pretextual the prosecutor's explanation. Although Clem C. blamed himself, he disparaged his jury and indicated resentment about his criminal conviction.[43]

---

[42] *Lamson Trong Pham*, 2008 WL 176473 at *26.

[43] *Id.* at 31.

In his Traverse, Pham claims that Clem C. took responsibility for his decisions which led up to his criminal conviction, and thus, he was a perfectly acceptable juror.  As the Court of Appeal observed, the fact that Clem C. *might* have been able to set aside his negative experience with the criminal justice system, does not render the prosecution's reason for dismissal a pretext for racial discrimination.  The record is clear that Clem C. disparaged the jury in his criminal case and indicated resentment about his criminal conviction.[44]

Pham has failed to show that decision of the California Court of Appeal was contrary to established federal law, or that it constituted an unreasonable determination of the facts.  Pham is not entitled to relief on this claim.

<u>Gilda B.</u>

Gilda B., who was Hispanic, was also excluded on the basis of a peremptory challenge.  The reason given by the prosecutor for dismissing her was: "Gilda B. had a daughter with a DUI (which in itself did not bother the prosecutor) plus a brother-in-law who was prosecuted and convicted for serious offenses, including robbery and armed robbery at ATMs, three years ago, and Gilda B. attended those court proceedings.  The prosecutor was not willing to accept her statement that she could be fair."[45]  The trial court found the proffered, racially-neutral reason was acceptable, and the Court of Appeal agreed, holding:

> The prosecutor explained his reasons for excluding Gilda B.: She had a brother-in-law who was convicted of serious offenses, including robbery and armed

---

[44] *Id.*

[45] *Id.* at *26.  It was later discovered that Gilda B.'s brother-in-law was convicted fifteen years ago, not three years ago (except a three-year-old case in which he was released).  However, the trial court concluded the statement regarding the date of conviction was a mistake by the prosecutor rather than an intentional misrepresentation, and that the crimes were still serious.

robbery at ATMs, three years ago, and Gilda B. attended those court proceedings. The prosecutor was not willing to accept her statement that she could be fair.

That the robberies were 15 years ago rather than three is of no consequence, since the trial court concluded it was a mistake by the prosecutor rather than an intentional misrepresentation, and the crimes were serious. Contrary to the defense argument, the prosecutor did not place "great emphasis" on the year the crime was committed. Defendants assert the prosecutor did not probe Gilda B. to the same depth as the person with the military discharge; Gilda B.'s cousin worked in law enforcement; and Gilda B. said she believed her felon brother-in-law got what he deserved.

None of these points demonstrates reversible error. Lamson cites People v. Turner (1986) 42 Cal.3d 711 at page 727, for the proposition that a prosecutor's failure to engage prospective jurors in more than desultory voir dire is a factor supporting an inference that the challenge was based on group bias. However, that statement in Turner related to the prosecutor's explanation that he excused a Black prospective juror because she said she could not sit impartially because she was a mother of children. ( Id. at pp. 726-727.) The Supreme Court observed her comment was much more ambiguous and was unexplored by the prosecutor. ( Ibid.) Here, in contrast, it is undisputed that the prospective juror had a brother-in-law who was convicted of armed robberies. This fact in itself justified the prosecutor's decision, and he was not required to take up court time in useless probing. We note the voir dire consumed over 1,000 pages of transcript.[46]

In his Traverse, Pham argues that a comparative juror analysis proves the prosecutor's reasons for dismissing Gilda B. were pretexts for discrimination.  Without developing his argument, Pham simply asserts that other empaneled jurors had the same characteristics which made Gilda B. undesirable to the prosecution.  While the subjects of a comparative juror analysis need not share identical characteristics,[47] Pham does not point to any jurors who are similarly situated to Gilda B.  Presumably, Pham is raising the same arguments that he raises with respect to his other claims: that certain empaneled jurors had criminal records or were acquainted with individuals who had been convicted of crimes.  However, as the Court of Appeal noted, Gilda B. had a close relative who had been convicted of a very serious crime and she had attended the

---

[46] *Id.* at *31-32.

[47] *Miller-El v. Dretke*, 545 U.S. 231, 247 n.6 (2005).

proceedings, whereas the empaneled jurors who had criminal records had been convicted of relatively minor infractions.[48]  The prosecutor was simply not comfortable that Gilda B. could set aside her previous experience with the criminal justice system given the nature of her relationship with the defendant (her brother-in-law) and the severity of his crime.  "The court found the prosecutor's reasons for excluding Gilda B. were genuine and legitimate"[49] and Pham has failed to show that this decision was contrary to established federal law, or that it constituted an unreasonable determination of the facts.  Pham is not entitled to relief on this claim.

<u>The Trial Court Erred by Allowing the Admission of Gang Evidence</u>

Although the prosecutor chose not to prosecute Pham and his confederates under anti-gang statutes, the prosecution submitted evidence concerning the dynamics of gang conflicts and issues of gang values.  Lamson objected on grounds the evidence to be admitted was impermissible propensity evidence.  The trial court ruled that, because no gang statute was charged but gang evidence may be relevant to motive,[50] the court would allow some gang evidence but it would be severely limited.[51]  The Court of Appeal concluded the gang evidence was relevant to provide context to the conduct and conversation immediately preceding the

---

[48]  One of the empaneled jurors was involved in a civil action seeking reinstatement of a 19-year military pension which was taken away for smoking marijuana, which the prosecutor thought was a harsh penalty.  The only other possible criminal matters of the empaneled jurors were DUIs, which the prosecutor did not view as an issue because they were not comparable to armed robberies.  *Lamson Trong Pham*, 2008 WL 176473 at *27.

[49]  *Lamson Trong Pham*, 2008 WL 176473 at *28.

[50]  There was evidence that the shooting was motivated by a gang rivalry.

[51]  *Id.* at 5-6.

shooting.  When the two groups faced each other across the driveway, Pham's group asked "[w]here you all from?" before they pulled out their guns and started shooting.

The Supreme Court has acknowledged a "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."[52]  "The introduction of unfairly prejudicial evidence against a defendant in a criminal trial . . . does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice."[53]  "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."[54]  In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in Federal Constitution."[55]  The Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence.[56]  In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights.[57]  For example, the Supreme Court has barred the introduction of

---

[52] *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).

[53] *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998).

[54] *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983)).

[55] *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

[56] *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[57] *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

evidence in state-court criminal proceedings that violated the Fourth Amendment (search and seizure),[58] Fifth Amendment (confessions),[59] Sixth Amendment (Confrontation Clause),[60] and (right to counsel).[61]

Pham has not shown that the limited admission of gang evidence violated his right to a fundamentally fair trial, as defined by the Supreme Court.  On the other hand, the gang evidence was highly relevant for the jury to understand that the question, "[w]here you all from?" when posed by members of a street gang, represented a challenge to fight.  The gang testimony gave context to the shootings and helped the jury understand the charged offenses.  Specifically, because Pham admitted he was at the party and fired a gun in self-defense, the gang expert's limited testimony allowed the jury to fully evaluate the circumstances under which Pham fired his weapon.  Pham has not shown that decision of the California Court of Appeal was contrary to established federal law, or that it constituted an unreasonable determination of the facts.  Pham is not entitled to relief on this claim.

<u>The Trial Court Intruded on the Deliberative Process to Coerce a Verdict</u>

In his final ground, Pham contends the trial court coerced a hold-out juror into reaching a verdict and deprived him of his "constitutional judgment of each juror (sic)."[62]  After extensive

---

[58] *Mapp v. Ohio*, 367 U.S. 643 (1961).

[59] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[60] *Crawford v. Washington*, 541 U.S. 36 (2004); *Pointer v. Texas*, 380 U.S. 400 (1965) (transcript of preliminary hearing without assistance of counsel to confront and cross-examine absent witness inadmissible).

[61] *Burgett*, 389 U.S. at 114-15 (evidence of prior conviction obtained in violation of Sixth Amendment right to counsel inadmissible).

[62]  Petition, p. 39.

analysis, the Court of Appeal rejected Pham's contentions and held that the trial court's actions

did not violate Pham's rights.  This Court will review each of these issues individually.

I.  Procedural Background[63]

Jury deliberations began on Monday afternoon, February 14, 2005. The following week, **FN28** on Tuesday, February 22, 2005, the jury foreperson sent a note stating: "We need help. We have a juror who isn't able to follow the law/unable to apply the facts or the law to the evidence."

> **FN28**. The jury deliberated part of the afternoon on the first Monday, all day Tuesday, all day Wednesday, and all day Thursday. They did not deliberate Friday because a juror was sick. The following Monday was a holiday.

The trial court noted that inability to follow the law was one of the grounds for dismissal of a juror under section 1089. **FN29** After hearing counsel, the trial court, in reliance on People v. Cleveland (2001) 25 Cal.4th 466, decided to ask the jury foreperson three questions: (1) Is there a juror who has refused to follow the law; (2) Is the juror listening to or reading the instructions exactly as the court gave them; and (3) Who is the uncooperative juror? The court said it would then bring all the jurors into the courtroom and ask by a show of hands whether or not there was a juror who was refusing to follow the law. If the consensus was that such a juror existed, the court intended to question each juror individually, including the challenged juror, outside the presence of the others.

> **FN29**. Section 1089 provides in part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate . . . ."

The court questioned the foreperson outside the presence of the other jurors. The foreperson said the jurors wrote the note together. The court asked whether there was a juror or jurors unable to follow the law and how many. The foreperson said yes, one juror. In response to the court's questions whether that juror had listened to the instructions and was reading the instructions as given, the foreperson said, "I don't believe so" and, "I don't think so." The court asked which juror, and the foreperson said it was Juror No. 12. (Juror No. 12 was the sole Asian on the jury.) The court asked if this juror made up his or her mind before deliberations, and the foreperson said not as far as she knew. In response to the court's questioning, the foreperson said Juror No. 12 was not refusing to discuss the case and was "listening [to the other jurors]. He doesn't interrupt or anything. He's listening. I don't think it's processing." The foreperson stated her belief that the juror was just not following the law as given by the court. The court excused the foreperson and told her not to say anything to the other jurors.

---

[63] *Lamson Trong Pham*, 2008 WL 176473 at *34-38.

19

The court stated it did not want to rely on the opinion of the foreperson alone and would speak with the other jurors to safeguard defendants' rights. Bruce objected to the process. (Lamson later objected the court's questioning was excessive.)

The court called the jury in and reread CALJIC No. 1.00 **FN30** on juror duties and CALJIC No. 17.40 FN31 on jurors' individual opinions (over a defense objection that the instruction provided jurors with a vehicle to say that one juror was not following the law). The court refused a defense request to explain to the jury the distinction between following the law and disagreeing.

**FN30**. The court reread from CALJIC No. 1.00: "You must base your decision on the facts and the law. [¶] You have two duties to perform. First, you must determine what facts have been proved from the evidence received in the trial and not from any other source. A 'fact' is something proved by the evidence or by stipulation. A stipulation is an agreement between attorneys regarding the facts. Second, you must apply the law that I state to you, to the facts, as you determine them, and in this way arrive at your verdict and any finding you are instructed to include in your verdict. [¶] You must accept and follow the law as I state it to you, regardless of whether you agree with it. If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions. [¶] You must not be influenced by pity for or prejudice against a defendant. You must not be biased against a defendant because he has been arrested for this offense, charged with a crime, or brought to trial. None of these circumstances is evidence of guilt and you must not infer or assume from any or all of them that a defendant is more likely to be guilty than not guilty. You must not be influenced by sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and a defendant have a right to expect that you will conscientiously consider and weigh the evidence, apply the law, and reach a just verdict regardless of the consequences."

FN31. The court reread CALJIC No. 17.40: "The People and the defendant are entitled to the individual opinion of each juror. [¶] Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. [¶] Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors, or any of them, favor that decision. [¶] Do not decide any issue in this case by the flip of a coin, or by any other chance determination."

The court then said to the jurors: "I need to know whether any of you feels that any other juror or jurors are not following the instructions that I just gave to you, that are not following the law, that are not deliberating and then are not considering others opinions. [¶] I need to see by a show of hands. Let me rephrase that. Lower your hands because I saw a quizzical expression on someone's face, and I told you not to say anything. And that juror was following what I just said wasn't anything-anything [ sic ].

20

[¶] But what I need to know is this. In light of the two instructions that I just reread to you, having those in mind, is there anyone who feels that any other juror or jurors are not following those instructions that I just gave to you, that are not following the law, that are not deliberating and not considering others ['] opinions?" All jurors raised a hand except Juror No. 4.

The trial court questioned each juror individually outside the presence of the others, with an admonition not to discuss specifics and not to discuss the inquiry with the other jurors. Juror No. 4 said everyone was doing as the court instructed but he/she was not sure if everybody understood the instructions the same way, and maybe Juror No. 12 did not understand or just saw things a different way. The other jurors mainly agreed Juror No. 12 was participating in deliberations and exchanging ideas, but some said he was not following the instructions and the law. Some thought he was confused. One thought he "refuses to put the evidence and the law together as a reasonable person" and, in response to the court's question whether Juror No. 12 had given the elements of the crime another interpretation or was refusing to follow the law in the instructions, said Juror No. 12 "interprets the law from a ... [¶] ... [¶] [g]ang perspective."

The trial court then questioned Juror No. 12, who referred to himself as "following instructions and looking at the evidence and the facts and interpreting the law in a different way." He said he was deliberating with the others, listening to their ideas and exchanging ideas. He said he accepted the instructions on the elements of the crimes. He had no problems with the law. He said, "when I look at the evidence and the facts and preponderance of the evidence and inferences of what it justifies and what it points to, I have to look at that as something real. It's not what I feel. It's not just because I think it should be that way. I have to apply the law to what the evidence shows." He said he had no problem whatsoever, and the law and instructions were "very clear," and "when I look at the facts and the evidence and what it pertains to and what is actually more reasonable, I apply what you instructed me." The court admonished Juror No. 12 not to discuss their conversation with the other jurors. The judge said he did not want the juror to feel as though he were in trouble. The court asked if Juror No. 12 could retire for further deliberations and put this inquiry out of his mind, to which Juror No. 12 responded yes.

Outside the presence of all jurors, defense counsel agreed with the trial court's assessment that no grounds existed to remove the juror, though Bruce's lawyer said, "I think this whole process has a chilling effect on the individual juror. And I think without a doubt everybody knows who they're talking about, and he knows that everybody's talking about him. [¶] And I'm just [a] little concerned that if you don't discharge him, 'cuz I don't want you to discharge him, what effect that's going to have on further deliberations." After further discussion, the trial court said, "I think the case law envisions this does have a chilling effect on jurors to some extent. [¶] But I also think that when you read the cases, the cases are pretty consistent with the manner in which the Court is required to conduct an inquiry. [¶] And in this particular case, I think I would have been remiss as a judge if it [ sic ] hadn't conducted some inquiry to find out. Because essentially one after the other, you had jurors coming up here saying he didn't follow the law. He's not following the law. [¶] And ... if you were talking about applicable issues or issues that would affect the defendant's due process and what

process is due. If you refrain from questioning these witnesses [ sic ], doesn't that deny these defendants a certain process? [¶] And like I said, it could hurt the defendant. Maybe it iners [ sic ] to their benefit[ ]. I don't know. But we at least have to find out .[¶] And the best way to find out is to question them. And what did we find out when we talked to sort of the golden edge [ sic ] was Juror Number 12. Oh, yeah. I have understand [ sic ] your law. I have no qualms with you[r] law. You heard me ask, can I give you any clarification? No. I don't need any clarification. My interpretation is just different. [¶] That's what the systems [ sic ] envisions. The systems [ sic ] envisions, perhaps we might not like it. But we have one person who can stand up and say you know what, my interpretation is just as reasonable as those other 11 people standing there. And that's essentially what is-he is saying to us. You know, that I'm sticking by my guns here." The court reiterated it felt compelled to make the inquiry because the jurors' note indicated someone was "unable to follow the law," which is a ground for dismissal under section 1089.

The trial court called in the jury and again reread for the jury CALJIC No. 1.00 and No. 17.40 and also reread CALJIC No. 17.41 **FN32** at the prosecution's request and over defense objection. The jury resumed deliberations.

> **FN32**. CALJIC No. 17.41 said: "The attitude and conduct of jurors at all times are very important. It is rarely helpful for a juror at the beginning of deliberations to express an emphatic opinion on the case or to announce a determination to stand for a certain verdict. When one does that at the outset, a sense of pride may be aroused, and one may hesitate to change a position even if shown it is wrong. Remember that you are not partisans or advocates in this matter. You are impartial judges of the facts."

The next day, Wednesday, February 23, 2005, the jurors sent the court a note reporting their disagreement pursuant to CALJIC No. 8.75, which told the jury, "If you are unable to reach a unanimous verdict as to the charge in Count 1 of first degree murder, do not sign any verdict forms as to that count and report your disagreement to the Court."

The court calculated the jury had spent about four full days deliberating. The court indicated it would give the instruction we approved in People v. Moore (2002) 96 Cal.App.4th 1105. Defendants objected and asked that if the court gave the instruction, it should change one thing: Instead of using Moore's language that it was the jurors' duty to arrive at a verdict if they could do so "without violence to your individual judgment," the court should say it was their duty to arrive at a verdict if they could do so "without surrendering your individual judgment." Nevertheless, on the following day, the trial court, after confirming the jury was deadlocked on the first degree murder in count 1, instructed with the language we approved in Moore, supra, 96 Cal.App.4th at pages 1118 through 1120, as follows:

> "It has been my experience on more than one occasion that a jury which initially report[ed] it was unable to reach a verdict, was ultimately able to arrive at verdicts on one or more of the counts before it.

"To assist you in your further deliberations, I am going to further instruct you as follows:

"Your goal as jurors should be to reach a fair and impartial verdict, if you are able to do so, based solely on the evidence presented and without regard for the consequences of your verdict regardless of how long it takes to do so.

"It is your duty as jurors to carefully consider, weigh and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors.

"In the course of your further deliberations, you should not hesitate to reexamine your own views or to request your fellow jurors to reexamine theirs.

"You should not hesitate to change a view you once held if you are convinced it is wrong or to suggest other jurors change their views if you are convinced they're wrong.

"Fair and effective jury deliberations require a frank and forthright exchange of views.

"As I previously instructed you, each of you must decide the case for yourself and you should do so only after a full and complete consideration of all of the evidence with your fellow jurors.

"It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment.

"Both the People and the defendants are entitled to the individual judgment of each juror.

"As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.

"May I suggest that since you have not been able to arrive at a verdict using the methods that you have chosen, that you consider to change [ sic ] the methods you have been following at least temporarily and try new methods. [¶] For example, you may wish to consider having different jurors lead the discussions for a period of time or you may wish to experiment with reverse role playing by having those on one side of an issue present and argue the other side's position and vice versa. This might enable you to better understand the other's position. [¶] By suggesting you should consider changes in your methods of deliberations, I want to stress that I am not dictating or instructing you as to how to conduct your deliberations. [¶] I merely find you may find it productive to do whatever is necessary to insure

23

each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.

"I also suggest you reread CALJIC instruction 1.00 on page 1 and CALJIC instruction 17.40 on page 21 and CALJIC instruction 17.41 on page 21.[¶] These instructions pertain to your duties as jurors and make recommendations on how you should deliberate.

"The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by the instructions.

"CALJIC instruction 1.00 defines the duties of a juror. [¶] The decision the jury renders must be based on the facts and the law .[¶] You must determine what facts have been proved from the evidence received in the trial and not from any other source. [¶] A fact is something proved by the evidence or by a stipulation. [¶] Second, you must apply the law I state to you to the facts as you determine them and in this way arrive at your verdict. [¶] You must accept and follow the law as I state it to you regardless of whether you agree with the law. [¶] If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law you must follow my instructions.

"CALJIC 17.40 defines the jury's duty to deliberate. [¶] The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the Court. [¶] These are the matters this instruction requires you to discuss for the purpose of reaching a verdict.

"CALJIC 17.41 is an instruction which recommends how jurors should approach their task.

"You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments and suggestions I have made in the instructions now presented to you.

"I hope my comments and suggestions may have [ sic ] some assistance to you.

"You're ordered to continue your deliberations at this time."

After further deliberations, the jury returned their verdicts later that day. As indicated, the jury found all three defendants guilty of second degree murder. The jury also found Lamson guilty of two counts of attempted murder with personal use of a firearm. The jury found Sutter guilty of two counts of attempted murder but found untrue the firearm allegations as to him. The jury found Bruce guilty of attempted murder of

24

V.D. with personal firearm use, but the jury deadlocked as to Bruce on the charge of attempted murder of T.T.

Questioning of Juror No. 12

Pham contends that the trial court's questioning of the jurors had a chilling effect on the "hold-out" juror and improperly coerced him into reaching a verdict.  Although Pham contends that proceedings highlighted the fact that Juror No. 12 was the "only" holdout juror who favored acquittal, this conclusion is not supported by the record.  While the record indicates that some of the jurors thought that Juror No. 12 was not applying the law to the facts, there is no indication that he was the only juror who favored acquittal.[64]

The right to a unanimous jury is not among the Sixth Amendment rights extended to state criminal defendants by the Fourteenth Amendment.[65]  The Due Process Clause of the Fourteenth Amendment does, however, protect against the "arbitrary deprivation" of a liberty interest to which a defendant is "entitled under state law."  California law, generally "entitle[s]" criminal defendants to a unanimous jury verdict, but allows a trial judge to make inquiries concerning jurors' performance of their duties and to remove a juror for "good cause," as long as the juror's inability or unwillingness to perform her duties "appear[s] in the record as a demonstrable reality."[66]

---

[64] The Court of Appeal's opinion could be read to imply that there was only one "hold-out" juror who favored acquittal.  During the court's questioning concerning Juror No. 12, one juror indicated Juror No. 12 was looking at the case from a "gang perspective," which suggested Juror No. 12 might favor the defense.  However, the jurors did not seem to indicate that Juror No. 12 was the *only* juror favoring the defense and the court never polled the jury on where they stood.

[65] *Apodaca v. Oregon*, 406 U.S. 404, 406 (1972).

[66] *See People v. Cleveland*, 21 P.3d 1225, 1230 (Cal. 2001) (internal quotation marks omitted).

25

*Cleveland* held that, while the trial court must inquire into possible juror misconduct:

"[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists."[67]

The Court of Appeal concluded that the trial court's treatment of this matter complied with *Cleveland* and did not influence the proceedings.[68]  This conclusion is strengthened by the fact that, after the court questioned all of the jurors, the jury remained deadlocked on one count of attempted murder as to Bruce, which resulted in a mistrial as to that count.[69]  This analysis was a reasonable application of the standards set forth in *Hicks*, and this Court must defer to the resulting conclusion.[70]

Instructions Given During Deliberations

In his final claim, Pham essentially contends that the verdict against him was coerced, in violation of the Sixth Amendment's guarantee of a fair and impartial jury and the Fourteenth Amendment's guarantee of the right to due process.  In particular, Pham alleges that various supplemental instructions given by the trial judge effectively constituted an improper *Allen*-charge[71] to the jury, which had the effect of coercing a particular juror (Juror No. 12) into

---

[67]  *Id.* at 1237; People v. Thompson, 231 P.3d 289, 336-37.

[68]  *Lamson Trong Pham*, 2008 WL 176473 at *39.

[69]  *Id.* at *41.

[70]   See 28 U.S.C. § 2254(d)(1).

[71]   An *Allen* charge derives its name from *Allen v. United States*, 164 U.S. 492 (1896), in which the Supreme Court approved its use.

26

rendering a guilty verdict.  Although Pham does not use the term "*Allen* charge" in either his Petition or Traverse, the substance of his argument is that the trial court pushed the jury, more specifically Juror No. 12, to reach a verdict.

An *Allen* charge "is traditionally understood as 'an instruction to consider the point of view of others' when the jury has reached an impasse in its deliberations."[72]  The charge was originally approved in the *Allen* case and urged jurors in the minority to consider the fact that they are in the minority, to question seriously the correctness of their own opinions when they are opposed to those of the majority, and stated that jurors should consider that the case must be decided at some time.  The jurors were also told that they were selected in the same manner and from the same source from which any future jury must be chosen, and that there is no reason to suppose that the case would ever be submitted to 12 more intelligent, impartial, or competent persons, or that more or clearer evidence would be produced on one side or the other.[73]

Here, Pham appears to concede that the trial court's comments were not the typical or classic *Allen* instruction.[74]  Rather, relying on *Jiminez v. Myers*, Pham appears to argue that the trial judge's conduct, viewed in its totality, had the effect of constituting an improper, de-facto *Allen* charge.[75]  The fact that a trial court may have given an *Allen* charge is not, in and of itself,

---

[72]  *United States v. Wills*, 88 F.3d 704, 716 (9th Cir. 1996) (internal citations omitted). *See Jiminez v. Myers*, 40 F.3d 976, 980 (9th Cir. 1993) (per curium) (stating that an *Allen* charge instructs the jurors to work towards unanimity and the minority to reexamine its views).

[73]  *See Allen*, 164 U.S. 492.

[74]  Traverse, pp. 25-27 (Urging this Court to consider the "totality of the circumstances" to determine whether the instructions were coercive).

[75]  *See Jimenez*, 40 F.3d at 980 (finding that a trial court's comments and conduct, when viewed in the context of the particular case, constituted a "de facto" *Allen* charge).  This Court examines Pham's claim in light of the underlying matters from the record.  In *Jimenez*, a

a basis for federal habeas relief.  "An *Allen* charge is, on occasion, a legitimate and highly useful

reminder to a jury to do its duty."[76]  The Ninth Circuit has repeatedly opined that the use of an

*Allen* charge must be upheld unless the record clearly shows that the charge impermissibly

coerced the jury.[77]  A court may not grant habeas relief unless it is "clear from the record" that an

*Allen* charge was given and "had an impermissibly coercive effect on the jury."[78]

　　　　As an initial matter, this Court expresses doubt as to whether Pham's claim is cognizable

under AEDPA's standard of review which, in this context, provides for relief only if the state

court's decision is an unreasonable application of clearly established law as determined by the

United States Supreme Court.  The Supreme Court has never held that a "de facto" *Allen*

charge—a concept invented by the Ninth Circuit—is unconstitutional.  Indeed, the highest court

has never ruled that such a doctrine exists.  In *Jimenez*, a divided Ninth Circuit panel relied on

Ninth Circuit "totality of the circumstances" decisions[79] to create the doctrine of a "de facto"

––––––––––––––––––––

pre-AEDPA decision, the Ninth Circuit noted that the question of jury coercion is a mixed
question of law and fact which requires de novo review on appeal.  40 F.3d at 979.  However, the
Supreme Court has made clear that the applicability of the AEDPA's Section 2254(d) deferential
standard of review does not turn on pre-AEDPA distinctions made between questions of law,
questions of fact, and mixed questions.  The Section 2254(d)(1) standard applies whether the
issue is a mixed question of law and fact or otherwise.  *See Williams v. Taylor*, 529 U.S. 398-
408.

　　[76]  *United States v. Plunk*, 153 F.3d 1011, 1027 (9th Cir.1998) (quoting *Rodriguez v.
Marshall*, 125 F.3d 739, 750 (9th Cir. 1997)) *abrogated on other grounds by Mancuso v.
Olivarez*, 292 F.3d 939, 949 n.4 (9th Cir. 2002).

　　[77]  *See, e.g., Id.* at 1027-28; *United States v. Hernandez*, 105 F.3d 1330, 1333 (9th Cir.
1997); *United States v. Lorenzo*, 43 F.3d 1303, 1307 (9th Cir. 1995).

　　[78]  *Rodriguez*, 125 F.3d at 750.

　　[79]  The Ninth Circuit did note that the Ninth Circuit's "totality of circumstances" test is
based on *Jenkins v. United States*, 380 U.S. 445, 446 (1965), and also cited to *Lowenfield v.
Phelps*, 484 U.S. 231, 237 (1988).  *Jiminez*, 40 F.3d at 980 n.2.

*Allen* charge.[80]  In doing so, the majority concluded that, because the "totality of the

circumstances" test was well-established, the Supreme Court's decision in *Teague v. Lane*, 489

U.S. 288 (1989), was inapplicable.[81]  In dissent, Justice Kozinski charged that the majority,

through its creation of the "de facto" *Allen* charge concept, the Ninth Circuit was "invent[ing] a

whole new doctrine," in violation of *Teague*.[82]  The Supreme Court has made clear that law

created by a federal appellate court is not "clearly established Federal law" within the meaning

of AEDPA.[83]

       When faced with a question as to whether the ruling of the Ninth Circuit reflects the

holdings of Supreme Court decisions, this Court may look to other circuits to determine what

they think federal law on the issue to be.[84]  At least two other Circuit Courts have questioned the

reasoning and holding in *Jimenez*.[85]  Thus, this Court is unconvinced that a state court's failure to

---

    [80]   *Jimenez*, 40 F.3d at 980-981.

    [81]   *Id.* at 981.  The Supreme Court's *Teague* opinion commonly is construed to stand for
the proposition that new constitutional rules of criminal procedure will not be applied
retroactively on collateral review of a final conviction.  *Teague*, 489 U.S. at 310.

    [82]   *Jimenez*, 40 F.3d at 981.

    [83]   *Williams*, 529 U.S. at 412 (Section 2254(d)(1) "restricts the source of clearly
established law to this Court's jurisprudence"); *Van Tran v. Lindsey*, 212 F.3d 1143, 1154 (9th
Cir. 2000) *disapproved of on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

    [84]   *Alberni v. McDaniel*, 458 F.3d 860, 865 (9th Cir. 2006) ("[W]hen faced with a novel
situation we may turn to our own precedent, as well as the decisions of other federal courts, in
order to determine whether the state decision violates the general principles enunciated by the
Supreme Court and is thus contrary to clearly established federal law.").

    [85]   *Stallings v. Delo*, 117 F.3d 378, 382 (8th Cir. 1997) (distinguishing the reasoning and
holding in *Jimenez* that a due process violation resulted from the totality of the circumstances);
*Montoya v. Scott*, 65 F.3d 405, 414 (5th Cir. 1995) (citing Chief Judge Kozinzki's dissent and
questioning the persuasiveness of the Ninth Circuit's reasoning).

explicitly extend the Supreme Court's decisions in *Allen*, *Jenkins*, and *Lowenfeld*, so as to invoke and address the concept of a "de facto" *Allen* charge in this case, can be said to constitute an objectively unreasonable failure to apply clearly established United State Supreme Court holdings—the standard required for AEDPA review.

However, in light of the existence of the *Jimenez* decision at the time of the California Court of Appeal's decision, this Court will assume, *arguendo*, that a state court's failure to find the existence of an impermissibly coercive "de facto" *Allen* charge[86] possibly could constitute an unreasonable application of clearly established Federal law under Section 2254(d)(1). This Court now will consider whether such a possibly unreasonable application occurred here.

As noted above, Pham concedes that no explicit *Allen* charge was given at his trial. Rather, Pham appears to rely upon the *Jimenez* "de facto" *Allen* charge concept as the predicate for his juror coercion claim. In *Jimenez*, after almost five hours of deliberation and a jury indication of deadlock, the trial judge inquired as to the number of votes taken and the numerical

---

[86] The Court of Appeal did, however, note that California law regarding supplemental *Allen* charges is more restrictive than federal law:

> As to the instruction when the jury deadlocked on the degree of murder, defendants acknowledge the trial court instructed the jury with language used by the trial court in a case we affirmed in [*People v. Moore*], 96 Cal.App.4th 1105 [(Cal. App. 2002)]. We there observed that *People v. Gainer* (1977) 19 Cal.3d 835 disapproved of an instruction permitted in federal court (*Allen v. United States* (1896) 164 U.S. 492, 501-502 [41 L.Ed. 528, 531] ) encouraging minority jurors to reexamine their views in light of the majority's views and to consider that the case must be decided at some time. (*Moore*, *supra*, 96 Cal.App.4th at p. 1120.) In *Moore*, supra, 96 Cal.App.4th at page 1121, we concluded the instruction given by the trial court did not constitute an improper *Allen* charge, and we commended the trial judge (Judge Michael G. Virga) for fashioning an excellent instruction. In a later case where instructional error led to reversal, *People v. Hinton* (2004) 121 Cal.App.4th 655 at page 661, we observed that the error could have been avoided had the trial court been aware of and used the *Moore* model. *Lamson Trong Pham*, 2008 WL 176473 at *40.

movement between the first and last votes.  The foreperson advised that there had been five or

six votes, which had split seven-five, eight-four, nine-three, and nine-two and one.  The trial

judge then inquired specifically as to the movement which had occurred between the last votes

and, after being advised of the specific numerical movement, stated: "Well, that's what's

important to me because of the nature of the case.  I want to find out that there has been

movement."[87]  After a three-day weekend and the recommencement of deliberations, the jury

again indicated a deadlock.  The trial judge, after noting that he previously had asked the jury

whether there had been any movement, again asked the jury the number of votes taken and the

numerical movement which had occurred.  After the foreperson indicated that two votes had

been taken and, in response to the judge's follow-up question, advised that the latest vote had

been 11-1, the trial judge stated: "So, there has been, then, substantial movement since the last

time . . . .  Due to the fact we have had that type of movement, I would request, then, to finish the

rest of today and see where we are at that point in time."[88]  The jury returned a guilty verdict at

the close of that day.[89]

The court in *Jimenez* found that, when "viewed against the backdrop of the particular

circumstances of the case," the trial judge's comments and conduct amounted to the giving of a

coercive "de facto" *Allen* charge:

> After the first impasse, by eliciting the progression in the voting, determining if it was
> moving in one direction, expressing his approval of that progression, and telling the jury
> to continue its deliberations, the trial court effectively instructed the jury to make every
> effort to reach a unanimous verdict.  In view of the disclosure after the second impasse

---

[87]  *Jimenez*, 40 F.3d at 978-979.

[88]  *Id.* at 979.

[89]  *Id.*

that only one juror remained in the minority and the trial court's implicit approval of the "movement" toward unanimity, the court's instruction to continue deliberating until the end of the day sent a clear message that the jurors in the majority were to hold their position and persuade the single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity.[90]

The court particularly noted the absence of any counter-balancing instruction that jurors are not to surrender their convictions, concluding that such a supplemental instruction was available under California law.[91]

The situation in Pham's case is markedly different than that presented in *Jimenez* and more akin to that in *Rodriguez v. Marshall*, albeit with some differences. In *Rodriguez*, the Ninth Circuit denied habeas relief after rejecting a claim that a "de facto" *Allen* charge should be found based on circumstances which occurred during deliberations. The jurors had declared themselves deadlocked on four occasions over 15 days and, on day 11, the trial judge inquired into the numerical split of the jurors. As a result, he learned that the vote remained at 11-1 after five ballots.[92] The Ninth Circuit rejected the petitioner's contention that this circumstance, coupled with the fact that the trial judge required the jury to continue deliberating despite repeated deadlocks, constituted a "de facto" *Allen* charge. The court first noted that, because the claim did not rest on an actual, explicit *Allen* charge, the court could not grant habeas relief unless it was "'clear from the record' 'that the alleged charge had an impermissible coercive effect on the jury.'"[93] The court then characterized the *Jimenez* decision as involving a failure by the trial judge to remind the jury of their duty not to surrender their sincerely held beliefs "while

---

[90]  *Id.* at 980-981.

[91]  *Id.* at 981 n.5.

[92]  *Rodriguez*, 125 F.3d at 742, 748.

[93]  *Id.* at 750 (internal citations omitted).

at the same time making it clear that he wished them to return a unanimous verdict."[94]  Neither circumstance was found to exist in *Rodriguez*: the trial judge had instructed the jurors to hold onto their beliefs and, after learning of the numerical split on five ballots, made no comment and did not know whether the majority favored conviction or acquittal or the identity of the hold-out juror.  Additionally, the jurors deliberated for four days after the numerical split inquiry.[95]

The repeated inquiries as to, and expressions of approval of, movement which were held to be dispositive in *Jimenez* are absent here.  Unlike in *Jimenez*, there were no repeated court inquiries as to votes taken and movement, and there was no direction to go back and deliberate in the face of a judge's comment:  "I want to find out that there has been movement."  Here, unlike in *Jimenez*, the trial judge did not exert constant pressure on the jurors to reach a verdict.  Instead, after the foreperson indicated the jury was deadlocked, the judge simply stated: "It has been my experience on more than one occasion that a jury which initially report[ed] it was unable to reach a verdict, was ultimately able to arrive at verdicts on one or more of the counts before it."[96]

This case is distinguishable from *Jimenez* in another significant respect.  As noted above, no counter-balancing instruction was given in *Jimenez* despite, as the Ninth Circuit found, the availability of such an instruction under California law.  Here, such an instruction was given.  The record reflects that CALJIC 17.40 was given, which states, among other things:

"The People and the defendant are entitled to the individual opinion of each juror."

---

[94]  *Id.*

[95]  *Id.* at 751.

[96]  *Lamson Trong Pham*, 2008 WL 176473 at *37.

"Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with other jurors."

"Do not hesitate to change an opinion if you are convinced it is wrong.  However, do not decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision."

Based on the above, this Court cannot conclude that the decision of the Court of Appeal was an unreasonable application of clearly-established federal law (as that concept is embodied in AEDPA) because the Court of Appeal failed to find that this case presented an instance of an improperly-coercive "de facto" *Allen* charge, as that concept was first promulgated in *Jimenez*.

Nor is there evidence that the supplemental instructions, irrespective of their status as an *Allen* charge, violated due process.[97]  The jury was never directed that it was required to reach a verdict, nor were any constraints placed on any individual juror's responsibility to weigh and consider all the evidence presented at trial.  The trial court also made no remarks either urging a verdict be reached or indicating possible reprisals for failure to reach an agreement.[98]

Pham's allegation that the supplemental instructions coerced the juror(s) who favored acquittal into reaching a verdict is further undercut by the fact the jury remained deadlocked on one count of attempted murder as to Bruce, which resulted in a mistrial as to that count.[99]  Pham has not shown that the decision of the California Court of Appeal was contrary to established

---

[97] *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (*citing Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

[98] Certainly, the trial court reminded the jurors that it was their duty to deliberate with the goal of reaching a verdict, if they were able to do so.  *Lamson Trong Pham*, 2008 WL 176473 at *37.

[99] Id. at *41.

federal law, or that it constituted an unreasonable determination of the facts.  Pham is not entitled

to relief on this claim.

<u>CONCLUSION AND ORDER</u>

Pham is not entitled to relief under any ground raised in the Petition.  Accordingly,

**IT IS HEREBY ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of

Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[100]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[101]

The Clerk of Court is to enter judgment accordingly.

Dated:  August 4, 2011.

_____/s/ James K. Singleton, Jr._____
**JAMES K. SINGLETON, JR.**
United States District Judge

---

[100]  28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) ("reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further" (internal quotation marks omitted)).

[101]  *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.